# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| HITACHI MEDICAL SYSTEMS AMERICA, INC., | ) ) ) | CASE NO.5:10CV384 |
| PLAINTIFF, | ) ) | JUDGE SARA LIOI |
| vs. | ) ) | |
| JOEL CHOE, et al., | ) ) | **MEMORANDUM OPINION AND ORDER** |
| DEFENDANTS. | ) ) ) | |

Before the Court are two cross-motions for summary judgment: (1) defendants' motion for partial summary judgment (Doc. No. 32, filed under seal), with plaintiff's opposition (Doc. No. 44), and defendants' reply (Doc. No. 47, filed under seal); and (2) plaintiff's motion for summary judgment (Doc. Nos. 33-34), with defendants' opposition (Doc. No. 43, filed under seal), plaintiff's reply (Doc. No. 50), and defendants' sur-reply (Doc. No. 56, filed under seal; filed with leave). Also before the Court is plaintiff's motion to strike portions of the affidavit of Daniel McGuan (Doc. No. 51, seeking to strike portions of Doc. No. 43-12), defendants' opposition (Doc. No. 54), and plaintiff's reply (Doc. No. 57).

For the reasons discussed below, Doc. No. 51 is **GRANTED IN PART and DENIED IN PART**.

With rulings made on individual issues as set forth below, Doc. No. 32 is **DENIED** and Doc. No. 33 is **DENIED**.

## I. BACKGROUND

**A.      Procedural Background**

On February 22, 2010, plaintiff Hitachi Medical Systems America, Inc. ("HMSA") filed a Complaint based on diversity jurisdiction[1] against defendants Joel Choe (d/b/a Cedar Hill Imaging and Hill Top MRI) and Image Makers, Inc. (Doc. No. 1.) HMSA alleged one count of breach of contract and one count of unjust enrichment, and requested declaratory judgment, compensatory damages, and reasonable attorney's fees, costs and expenses. An Amended Complaint was filed on May 20, 2010 (Doc. No. 16) against defendants Joel Choe (d/b/a Cedar Hill Imaging; Hilltop MRI; Hilltop MRI and X-ray Imaging; Hilltop Imaging & Diagnostic Center) and Image Makers, Inc.[2] for breach of contract (count one), unjust enrichment (count two) and declaratory judgment (count three), seeking the same relief as had been sought in the original complaint.

On May 28, 2010, defendants filed their Answer. Defendants Image Makers, Inc. and Hilltop Imaging & Diagnostic Center (a/k/a Hilltop Radiology, LLC) ("Hilltop") filed Counterclaims against HMSA. (Doc. No. 17.) Counts I and II of the Counterclaim allege that HMSA breached the Service Maintenance Agreements by failing to: (1) provide the promised

---

[1] There is no dispute that the parties have diverse citizenship and that the amount in controversy exceeds $75,000.

[2] Defendant Image Makers, Inc. is registered in South Carolina as "Imagemaker, Inc." and is also registered to conduct business in Texas. The parties have stipulated that "Imagemaker, Inc." is the proper entity for purposes of this litigation. Otherwise, there is a fair amount of confusion over the exact identity of the other defendants. Generally speaking, plaintiff alleges that Joel Choe and/or Image Makers, Inc. do business under various trade names. (Am. Compl. ¶ 5-8.) Although admitting that Image Maker, Inc. does business in Texas under the trade name Cedar Hill Imaging, Choe and Image Maker, Inc. deny doing business as alleged under the various other trade names. (Am. Compl. ¶¶ 5-8; Answer, ¶¶ 5-8.) Choe denies any individual liability under any of the contracts at issue. In an affidavit filed in support of defendants' motion for partial summary judgment, Choe attests that defendant Image Maker, Inc. does business as Cedar Hill Imaging Center and that he is a shareholder and its CEO (Choe 10/11/10 Aff., ¶¶ 2, 6) and that defendant Hilltop Radiology, LLC does business both as Hilltop MRI and X-ray Imaging and as Hilltop Imaging & Diagnostic Center and that he is Hilltop Radiology's managing member. (*Id.*) He is also the managing member of a non-party entity known as KC Imaging, LLC, the entity which entered into the very first SMA with HMSA. (*Id.*, ¶ 6.) For ease of reference herein, the Court refers to all defendants simply as "defendants."

monthly preventative maintenance when due, (2) timely and properly fix problems, and (3) maintain the equipment to manufacturer's specifications for the equipment located at Image Makers (Count I) and Hilltop (Count II). HMSA filed an Answer to the Counterclaim on June 17, 2010. (Doc. No. 18.)

**B.      Factual Background**

Defendants are engaged in the business of medical imaging where they use magnetic resonance imaging equipment. (Choe 10/11/10 Aff. ¶ 2.) The MRIs and CT scanners at issue in this case were purchased from HMSA. The MRI machines are located at two sites: Imagemaker, Inc. d/b/a Cedar Hill Imaging in Cedar Hill, Texas (Serial No. H067) ("Texas MRI") and Hilltop Radiology, LLC d/b/a Hilltop MRI in Richmond, California (Serial No. A064) ("California MRI"). A CT scanner is also located at each of the two sites: Serial No. CXR46222 ("Texas CT") and Serial No. CXR46215 ("California CT"). (Choe 10/11/10 Aff. ¶¶ 4-5, 8, 12.)

**1.      The California MRI (A064)**

On August 10, 2004, defendant Choe, on behalf of KC Imaging, LLC,[3] signed a Service Maintenance Agreement ("SMA") with HMSA in conjunction with the purchase of the California MRI. (Choe 10/11/10 Aff. ¶ 7.)[4] Due to construction delays, the California MRI was not delivered until two years later. (*Id*. ¶ 9; Choe 7/12/10 Dep. at 86-87.) Therefore, a new SMA was signed by Choe on June 16, 2006 for the same machine. (Am. Compl. Ex. D.) Although this SMA shows Hilltop MRI as the "purchaser," that entity did not even exist until July 2008. (*See*

---

[3] Choe claims that KC Imaging was originally formed to operate the Hilltop location. (Choe 7/12/10 Dep. at 69.)

[4] Although reference is made to this SMA between HMSA and KC Imaging, LLC, no one has supplied a copy.

Doc. No. 34-5.) Choe claims that KC Imaging was the party he intended to bind by his signature in the "Customer Acceptance" box. (Choe 10/11/10 Aff. ¶ 9.)

This SMA provided for a 3-month warranty after which the agreement was effective for twelve months. The SMA called for, *inter alia*, preventative maintenance "[t]welve (12) times annually." This included "inspection, adjusting, tuning, lubrication, and replacement of non consumable parts as determined to be necessary by HMSA." The inspections were "to be provided as outlined by the Manufacturer's specifications." The annual cost of the contract was $76,500 and it was invoiced monthly, in advance, at a rate of $6,375. (Choe 10/11/10 Aff. ¶ 15.)

Immediately under the signature boxes on this SMA, in small print, was the following provision:

> Upon the occurrence of an Event of Default, HMSA may, at any time, declare the unpaid balance for the remaining term of this SMA to be immediately due and payable. Any one or more of the following events shall constitute an Event of Default: (i) Customer fails to pay any monies due HMSA pursuant to this SMA; (ii) Customer becomes insolvent, a receiver is appointed for any part of the Customer's property, Customer makes an assignment for the benefit of creditors, or any proceeding is commenced either by or against Customer under any bankruptcy or insolvency laws; or (iii) Customer defaults in any obligation owing HMSA pursuant to this SMA or otherwise.

Also, contained in Section 11 of the SMA, captioned "Miscellaneous," was the following provision:

> HMSA shall not be liable for special incidental or consequential damages. Consequential damages shall include, without limitation, loss of use, income or profit or loss of or damage to persons or property.

This was the fourth of six paragraphs under "Miscellaneous" and it was not set off in any special typeface to draw attention to it.

The California MRI was "upgraded" from an AIRIS to an AIRIS II by third-party service vendor Viable Med Services, Inc. ("Viable Med") in December 2009. (Choe 7/12/10

Dep. at 57.) Choe selected Viable Med rather than HMSA to perform the upgrade due to cost. (*Id*.) He claimed that he "had to do something[ ]" because he had "major issues with losing doctors and patient complaints[.]" (*Id.*) After the upgrade, HMSA refused to service the machine and defendants, therefore, refused to make the monthly payments. (*Id*. at 123-24.)

### 2.    The Texas MRI (H067)

On October 1, 2004, Choe, on behalf of Image Makers, Inc., signed an SMA with HMSA for maintenance of the Texas MRI. (Am. Compl. Ex. A; Choe 10/11/10 Aff. ¶ 11.) The SMA contained the same terms as the SMA for the California MRI, but was at an annual cost of $57,000, invoiced in monthly increments of $4,750. Image Makers failed to make the monthly payments, as acknowledged by Choe. Therefore, on February 19, 2009, HMSA entered into a payment plan ("the Letter Agreement," Choe 7/12/10 Dep. Ex. A CHOE000011) under which the past due balance could be paid. However, Image Makers also defaulted on that plan and, pursuant to the Letter Agreement's terms, a "service hold" was applied on October 1, 2007. (Polon Aff. ¶ 9.)

On February 14, 2009, Choe also entered into a Revised SMA for the Texas MRI on behalf of Image Makers. (Am. Compl. Ex. E.) The revised SMA contained the same annual cost, but provided for preventative maintenance "at the manufacturer's recommended intervals (quarterly, four (4) times annually)." At his deposition, Choe admitted that the payments were "one month behind." (Choe 7/12/10 Dep. at 85.)

### 3.    The Texas CT (CXR46222)

In March 2006, HMSA and Image Makers entered into an SMA for the Texas CT. (Am. Compl. Ex B; Choe 10/11/10 Aff. ¶ 12.) Choe executed the agreement as the CEO of Image Makers. This SMA provided for preventative maintenance "[s]ix (6) times annually." The

annual cost was $62,000, invoiced monthly at a rate of $5,166.66. Otherwise, all of the terms were the same as the other SMAs.

Choe admitted that the payments were in default because "the practice is not growing at the rate to cover these costs." (Choe 7/12/10 Dep. at 88.)

### 4. The California CT (CXR46215)

On May 2, 2006, Choe and HMSA entered into an SMA for the California CT. (Am. Compl. Ex. C; Choe 10/11/10 Aff. ¶ 13.) Choe claims to have signed this SMA in his capacity as owner of Hilltop MRI; however, he himself was actually listed as the "purchaser" at the top of the SMA. The SMA provided for preventative maintenance "[s]ix (6) times annually." The annual cost was $62,000, invoiced monthly at a rate of $5,166.66. All other terms were the same as the other SMAs.

After the three-month warranty period, Choe failed to make any monthly payments. (Choe 9/21/10 Dep. at 14.)

## II. STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure, addressing Summary Judgment, provides in relevant part as follows:

> **(a)** **Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense--or the part of each claim or defense--on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

[ * * *]

> **(c)** **Procedures.**

6

    **(1)**    ***Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:

        **(A)**    citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

        **(B)**    showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

    [* * *]

    **(3)**    ***Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

    **(4)**    ***Affidavits or Declarations.*** An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

[* * *]

**(e)**    **Failing to Properly Support or Address a Fact.** If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may:

    **(1)**    give an opportunity to properly support or address the fact;
    **(2)**    consider the fact undisputed for purposes of the motion;
    **(3)**    grant summary judgment if the motion and supporting materials-- including the facts considered undisputed--show that the movant is entitled to it; or
    **(4)**    issue any other appropriate order.

[* * *]

**(g)**    **Failing to Grant All the Requested Relief.** If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact--including an item of damages or other relief--that is not genuinely in dispute and treating the fact as established in the case.

A movant is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *White v. Turfway Park Racing Ass'n.*, 909 F.2d 941, 943-44 (6th Cir. 1990). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id*. at 252.

Summary judgment is appropriate whenever the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322. Moreover, "the trial court no longer has a duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), *citing Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1034 (D.C. Cir. 1988). The non-moving party is under an affirmative duty to point out specific facts in the record as it has been established which create a genuine issue of material fact. *Fulson v. Columbus*, 801 F. Supp. 1, 4 (S.D. Ohio 1992). The non-movant must show more than a scintilla of evidence to overcome

summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Id*.

### III. DISCUSSION

**A.      Motion to Strike (Doc. No. 51)**

Plaintiff filed a motion to strike portions of Doc. No. 43-12, the Affidavit of Daniel McGuan.[5] This motion must be resolved before the Court addresses the cross-motions for summary judgment.

McGuan is the President of Viable Med Systems, Inc. (McGuan Aff. ¶ 2.) From 1991 to 2005, he was employed by HMSA as a Field Service Engineer and Director of Support Service and New Product Integration. In that capacity, he performed numerous upgrades of Hitachi MRI machines, including the AIRIS and AIRIS II. He was one of the technical experts involved in multiple upgrades. (*Id*. ¶ 3.)

Viable Med was hired by Choe in December 2009 to upgrade the California MRI from an AIRIS to an AIRIS II. (*Id*. ¶ 4.) McGuan claims: "Viable Med performed this upgrade in the same manner that I had performed upgrades when I was employed by HMSA using its approved methods and original equipment manufacturer parts." (*Id*.) He also attests that "Viable Med included an inventory of serial numbers of the new parts used during the upgrade in the California MRI so it would assist HMSA in having that information for their system history files and to assist them in servicing this machine, if it chose to do so." (*Id*. ¶ 5.)

_____

[5] The Affidavit makes reference to several exhibits which should have been attached. However, none of those exhibits were submitted.

Plaintiff argues that ¶¶ 6, 7, 11, 12, 13, 14, and 18 of the Affidavit contain legal conclusions and/or are not made on personal knowledge. Defendants filed their opposition to the motion and plaintiff filed a reply. (Doc. Nos. 54 and 57, respectively.)

**1.     Paragraphs 6, 7, 14 and 18**

These paragraphs of the Affidavit state as follows:

6.     Viable Med is a manufacturer under 21 CFR 820.3(o) when it performs the function of "installation" of medical devices such as the California MRI.

7.     However, Viable Med is not a remanufacturer under 21 CFR 820.3(w) because it does not process, condition, renovate, repackage, restore, or do any other act to the medical devices such as the California MRI that "significantly changes the finished device's performance or safety specifications, or intended use".

14.     Although HMSA contends in its Motion for Summary Judgment that Viable Med is not properly licensed to perform the upgrade under California law and cites Health & Safety Code, section 111615, that statute does not define the term "manufacturer". Instead, Section 109970 describes "manufacture" as "the preparation, compounding, propagation, processing, or fabrication of any food, drug, device, or cosmetic. The term 'manufacture' includes repackaging or otherwise changing the container, wrapper, or labeling of any food, drug, device, or cosmetic in furtherance of the distribution of the food, drug, device, or cosmetic. The term 'manufacture' does not include repackaging from a bulk container by a retailer at the time of sale to its ultimate consumer." As discussed above, I do not believe that Viable Med manufactured the California MRI by performing the upgrade, and I do not believe that Viable Med needed to be licensed in California as a manufacturer to perform the upgrade.

18.     HMSA [sic] contention that the installation information is only required during the initial installation is not accurate as I describe in my letter of September 27, 2010. The reference to my deposition testimony as set forth in my letter was intended to clarify that Viable Med is only a manufacturer when it performs installations of MRI devices. Viable Med is not a manufacturer when it performed the upgrade of the California MRI as discussed above and that was the subject of the deposition. A true and correct copy of the my [sic] letter is attached hereto as Exhibit "D" and is incorporated by reference.

10

The Court notes that, although reference is made in ¶ 18 to an "Exhibit D," no exhibits are attached to the affidavit. However, a copy of the particular September 27, 2010 letter is attached to the Affidavit of Robert McCarthy, used in support of plaintiff's motion for summary judgment. (Doc. No. 34-14.)

Plaintiff asserts that these paragraphs contain solely legal conclusions and, to the extent that an expert could be qualified to interpret FDA regulations (which HMSA does not concede), McGuan is clearly "not an FDA expert" (McGuan Dep. at 26), nor is he qualified to interpret any California legal regulations.

Defendants argue that McGuan merely "opines as [to] the classification and/or characterization of his company, Viable Med, under applicable state and federal laws." (Reply at 5.) Because he has almost twenty (20) years experience in the MRI machine industry, he has "sufficient personal knowledge and industry experience to offer an opinion on the classification and/or characterization of his company, Viable Med, under [. . .] 21 CFR 820.3." (*Id.*)

The Court is of the view that these paragraphs do attempt to offer legal conclusions. "The problem with testimony containing a legal conclusion is in conveying the witness' unexpressed, and perhaps erroneous, legal standards to the jury. *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985). Here, there is no jury and the Court is quite capable of rejecting any legal conclusions that are unwarranted. However, in the interest of having a clean record, the Court agrees that paragraphs 6, 7, 14 and 18 of McGuan's Affidavit must be stricken and, by this Order, they are so stricken.

2.      **Paragraphs 11, 12 and 13**

These paragraphs state:

11

11.     I have reviewed HMSA's Motion for Summary Judgment and its contention that it was aware that the California MRI had been upgraded by Viable Med, and that the upgrade was purportedly "in violation of numerous Federal and State Regulations, Viable Med destroyed the machine (the subject of the A064 SMA), and created a new medical device that is 'adulterated' and 'misbranded' in violation of the Federal Food, Drug, and Cosmetic Act." (Motion for Summary Judgment, at page vi.) This is not accurate because the only changes that Viable Med made during the upgrade were the same changes that HMSA submitted to the FDA in 1997 as being subject to its clearance, changes that were approved by the FDA in 1998 as making the AIRIS II "substantially equivalent" to the AIRIS, and the same changes I made when I performed upgrades during my employment by HMSA.

12.     In addition, I believe that HMSA had a legal obligation to report to the FDA pursuant to 21 CFR 820.198(c) any contention that the upgrade Viable Med performed "adulterated" the California MRI and made it virtually unrecognizable. There is no evidence that I am aware of that HMSA ever reported to the FDA the upgrade to the California MRI that Viable Med performed.

13      HMSA also characterized Viable Med's upgrade of the California MRI as "destroying the original machine". Again, this description, as well as all other pejorative descriptions of Viable Med's upgrade, is not accurate because Viable Med only performed an upgrade in the same manner as HMSA described to the FDA in 1997, that the FDA determined made the AIRIS II "substantially equivalent" to the AIRIS, and that I had performed while employed by HMSA.

Plaintiff argues that these paragraphs contain legal conclusions as to whether Viable Med acted in violation of federal and state regulations, whether HMSA had a legal obligation to report Viable Med to the FDA, and whether the changes made by Viable Med's upgrade were the same as those made by HMSA with FDA's approval.

Defendants assert that: (1) paragraphs 11 and 13 merely state a factual explanation of what Viable Med did when it upgraded the California MRI and how that compared to what McGuan did when he worked for HMSA, and (2) paragraph 12 merely expresses McGuan's opinion as to the general obligations of a company within the MRI machine

12

industry. In defendants' view, this is all admissible based on McGuan's long experience in the industry as well as his personal knowledge of the changes made to the California MRI and his previous personal knowledge obtained when he worked for HMSA.

In reply, plaintiff insists that McGuan, without supplying substantiating facts, is drawing inferences to support his assertion that Viable Med actually complied in its own right with the applicable regulations *and* that the changes made by Viable Med to the California MRI were the same changes as those submitted by HMSA and approved by the FDA. Plaintiff argues that McGuan's inferences are self-serving.

The Court finds that the first sentence of paragraph 12 presents an impermissible legal conclusion and, therefore, is stricken from the affidavit.

Paragraphs 11 and 13 present a little closer call. They do correctly relate an argument made in plaintiff's motion for summary judgment. They also declare that, in McGuan's opinion, any changes made to the California MRI were the same changes which HMSA had previously asked McGuan to make to various machines when he was employed by HMSA. These changes had, according to McGuan, been approved by the FDA and, therefore, Viable Med's making of those changes to the California MRI could not have destroyed the original machine.

Where paragraphs 11 and 13 arguably go wrong is in declaring that plaintiff's summary judgment argument and its "pejorative" descriptions of Viable Med's upgrade are "not accurate" *because* of what McGuan states as his opinion. It seems to the Court that whether the upgrades or changes were the same or whether they destroyed the original machine is the type of information that needs to be tested and determined by a *factfinder*, perhaps with the assistance of an expert. Of course, if a factfinder were to determine that the changes were the same, then *the*

13

*Court* would have to draw the legal conclusion as to whether the FDA's approval of those changes for use by HMSA would apply equally to Viable Med. Implicit in the FDA's approval for HMSA is its recognition that HMSA had the authority under the various regulations to make such changes to imaging devices. Of course, the legal question would remain as to whether Viable Med had such authority under the relevant regulations (i.e., whether Viable Med is, or needs to be, a "manufacturer" or a "remanufacturer" in order to be authorized to make changes approved by the FDA).

The Court perceives no need to strike paragraph 11 or 13. However, the information contained therein will not be accepted wholesale.

### 3. Summary Ruling on Motion to Strike (Doc. No. 51)

For the reasons set forth above, Doc. No. 51 is **GRANTED IN PART and DENIED IN PART**. Paragraphs 6, 7, 12, 14, and 18 are stricken from the Affidavit of Daniel McGuan (Doc. No. 43-12). To the extent paragraphs 11 and 13 contain legal conclusions, those conclusions are stricken. To the extent those two paragraphs merely state opinions or facts, they will be given whatever evidentiary treatment they deserve under the Federal Rules of Evidence.

### B. Cross-Motions for Summary Judgment (Doc. Nos. 32, 33)

Plaintiff's motion (Doc. No. 33) seeks summary judgment in its favor on both its own breach of contract claims and on defendants' counterclaims for breach of contract, including a summary judgment that defendants' claims for consequential damages are barred by the express language of the SMAs. The gravamen of plaintiff's argument on its own claims is that defendants have defaulted with respect to payment on all of the SMAs and that, with respect to two of the SMAs, defendant Choe is individually liable. As a result of these breaches, plaintiff

asserts that it is entitled to enforce the Acceleration Clause on the face of each SMA, requiring defendants to pay the balance due on the term of each SMA, rather than just the actual missed payments. Plaintiff also argues that it did not breach the SMAs and, therefore, defendants are not entitled to recover on their counterclaims for breach of contract. Further, plaintiff argues that the consequential damages that defendants seek are expressly barred by the SMAs.

Defendants seek partial summary judgment (Doc. No. 32), requesting a ruling in their favor on both plaintiff's breach of contract claims and their own breach of contract counterclaims. They argue with respect to their breach of contract counterclaims that HMSA failed to perform the maintenance required by the SMAs and, as a result, defendants were excused from making monthly payments to HMSA under the SMAs, entitling them to judgment in their favor on plaintiff's breach of contract claims. Defendants seek to recover consequential damages which resulted from HMSA's breach of contract. Defendants further seek a ruling that plaintiff's claim for unjust enrichment is barred as a matter of law because the parties are bound by the terms of their express contracts. Finally, defendants seek a ruling that defendant Choe is not individually liable for any purported contractual debts under the SMAs.

Thus, there are several questions that drive the cross-motions for summary judgment. First, did the defendants breach the SMAs by failing to make the necessary monthly payments? Second, if the defendants breached any SMA by failing to make a monthly payment, is the acceleration clause in the contract enforceable, so that defendants would be required to pay the entire balance on the contract? Third, did the provision in some of the SMAs requiring preventative maintenance "twelve (12) times annually" require *monthly* maintenance? If so, was that maintenance performed and, if it was not perfomed, does that failure constitute a material breach by plaintiff that excuses defendants' defaulted payments and/or invalidates the SMAs?

15

Fourth, if plaintiff breached the SMAs, are defendants entitled to any consequential damages? Fifth, is defendant Choe individually liable for any damages? Sixth, does plaintiff's unjust enrichment claim fail as a matter of law because it is based on the same facts as the breach of contract claim?

### 1.     Breach of Contract Claims and Counterclaims

To establish a breach of contract, a moving party must prove by a preponderance of the evidence that: (1) a contract existed;[6] (2) the non-breaching party fulfilled its contractual obligations; (3) the breaching party unlawfully failed to fulfill its contractual obligations; and (4) the non-breaching party suffered damages as a result of the breach. *Mikulski v. Centerior Energy Corp.*, 501 F.3d 555, 561 n.3 (6th Cir. 2007).

"Generally, a material breach of contract will entitle a party to stop performance." *Marion Family YMCA v. Hensel*, 178 Ohio App.3d 140, 142 (Ohio App. 3 Dist. 2008) (citation omitted). "A 'material breach of contract' is a failure to do something that is so fundamental to a contract that the failure to perform defeats the essential purpose of the contract or makes it impossible for the other party to perform." *Id*. at 142-43 (citation omitted). Generally, determination of whether a breach is material is properly left to the finder of fact. *Hanna v. Groom*, No. 07AP-502, 2008 WL 500530, at *3 (Ohio App. 10 Dist. Feb. 26, 2008) (citing *Ahmed v. University Hospitals Health Care System, Inc.*, No. 79016, 2002 WL 664026, at * 7 (Ohio App. 8 Dist. Apr. 18, 2002)).[7]

---

[6] Here, no party is challenging the validity of any of the contracts, although defendants do challenge individual contractual provisions.

[7] In *Kersh v. Montgomery Development Center*, 35 Ohio App.3d 61, 62-63 (Ohio App. 10 Dist. 1987), the court adopted the Restatement's five-factor test for determining whether a breach is material:
> (a) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

a.      **Did Defendants Make the Required Monthly Payments?**

For each SMA, Choe has admitted that defendants are in default of the monthly

payments, as outlined by the plaintiff in its motion for summary judgment:

- Regarding the Letter Agreement/Original H067 SMA: Choe admitted
  that the Defendants defaulted under the Original H067 SMA,
  renegotiated a payment plan, and then defaulted again:  "Q.  So you
  did not make all the payments that were required by this payment
  when they came due? A. No, I think we missed a couple, which I
  alerted them and let them know, and we're working on that." Choe
  7/12/10 Dep. at 82.

- Regarding the Revised H067 SMA: Choe further admits that he is
  delinquent on the Revised H067 SMA: "Q. And you made all the
  payments that are due? A. I believe I'm one month behind." *Id*. at 85.

- Regarding the CXR46222 SMA:   Q: "And have you made all the
  payments that were due under the [CXR46222 SMA]?" A: "No." Q.
  Why not? A. Well, the practice is not growing at the rate to cover these
  costs." *Id*. at 88.

- Regarding the CXR46215 SMA:   Q: "Did you make all the payments
  that came due under the terms of [the CXR46215 SMA]? A. No [...]. If
  we can get more patients, then I don't believe we would be in this
  position at all." *Id*. at 90-91. "[...] The reality of it is is [sic] we did not
  have the patient load or the referrals to sustain a CT practice. [...]" *Id*.
  at 92.

- Regarding the A064 SMA: The term of the A064 SMA was from
  November 2006 – October 2011. "Q.  But do you dispute in Exhibit C
  that you did not make the payments for the A064 for December '09,
  January, February '10, or any time after that? A. No, I did not pay for

_____

(b) the extent to which the injured party can be adequately compensated for the part of that benefit
of which he will be deprived;
(c) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;
(d) the likelihood that the party failing to perform or to offer to perform will cure his failure,
taking account of all the circumstances including any reasonable assurances;
(e) the extent to which the behavior of the party failing to perform or to offer to perform comports
with standards of good faith and fair dealing.
Restatement of the Law 2d, Contracts (1981) 237, § 241. *Accord*, *LaSalle Bank Natl. Assn. v. Belle Meadows Suites
L.P.*,, No. 23766, 2010 WL 3195773, at *6 (Ohio App. 2 Dist. Aug. 13, 2010); *Software Clearing House, Inc. v.
Intrak, Inc.*, 66 Ohio App.3d 163, 170 (Ohio App. 1 Dist. 1990).

that because they said that they were not going to service the machine. Q. After the upgrade? A. Yes." *Id.* at 123-124.

Plaintiff argues that, due to these breaches of contract by the defendants, it is entitled to rely on the acceleration clause of the SMAs to recover the following damages:

- <u>Letter Agreement</u>: Outstanding balance of $117.08. Polon Aff. ¶3 (Doc. No. 34-19).

- <u>Revised H067 SMA</u>: Outstanding balance of $230,351.28. Polon Aff. ¶ 4.

- <u>CXR46222 SMA</u>: Outstanding balance of $283,365.05. Polon Aff. ¶ 5. HMSA also performed service on the Texas CT not covered by the SMA. The unpaid balance for that service is $165.00. *Id.*

- <u>CXR46215 SMA</u>: Outstanding balance of $360,000. Polon Aff. ¶ 6.

- <u>A064 SMA</u>: Outstanding balance of $146,625.00. Polon Aff. ¶ 7.

Thus, the total amount of damages alleged by HMSA due to Defendants' breaches is $1,020,623.41. Polon Aff. ¶ 8. Plaintiff alleges that defendant Image Makers is liable to HMSA for the breaches under the Letter Agreement, Revised H067 SMA and CXR46222 SMA (totaling $513,998.41) and defendant Choe is individually liable to HMSA for the breaches under the CXR46215 SMA and A064 SMA (totaling $506,625.00).

Although defendants do not dispute that they did not make certain payments, they are of the view that a material breach by HMSA (namely, failure to perform the required maintenance) excused their obligation to pay and that, in any event, should they be found in breach, the acceleration clause which would require them to pay the *entire* balance on the SMAs is an unenforceable penalty provision. They also argue that Choe has no individual liability for any breach. Finally, defendants argue that, notwithstanding the express provision in the SMAs which limits plaintiff's liability, they are entitled to recover consequential damages relating to

18

the Viable Med upgrade of and lost referrals for the California MRI. All of these issues are discussed below.

### b. Did Plaintiff Perform the Required Preventative Maintenance?

This issue goes to whether plaintiff committed a material breach which would excuse performance (i.e., payments) by the defendants. In both their motion for partial summary judgment and their opposition to the plaintiff's motion for summary judgment, defendants argue that HMSA was required to perform preventative maintenance on a *monthly* basis and that HMSA failed to do so.[8]

The SMA relating to the California MRI (A064) provided for preventative maintenance "[t]welve (12) times annually." The original SMA for the Texas MRI (H067)

---

[8] Specifically, in their motion for partial summary judgment, defendants assert the following:

> At Hilltop, HMSA failed to provide the required PMs [preventative maintenance] for that site's MRI machine [the California MRI] for the following months: January 2007; April 2007; July 2007; August 2007; September 2007; February 2008; March 2008; May 2008; and October 2008. Similarly, at Cedar Hill, HMSA failed to provide the PMs for that sites [sic] MRI machine [the Texas MRI] for the following months: June 2006; March 2007; April 2007; October 2007; November 2007; and December 2007. HMSA also failed to provide a preventative maintenance call for Cedar Hill's CT scanner [the Texas CT] for July 2007. (Choe Aff. at ¶ 21). Indeed, HMSA's own service technician admitted in writing that a PM for Cedar Hill's CT scanner was not done on time. (See Tab 8, document bates-labeled CHOE000020).

(Doc. No. 32-1 at 11.) Not surprisingly, since defendants made no payments under the SMA for the California CT, there appears to be no assertion that HMSA breached the agreement by failing to make service calls for this machine. The Court notes that these same alleged breaches are argued by defendants in opposition to plaintiff's motion for summary judgment. (*See*, Doc. No. 43 at 5-6.)

The Court also notes that, in their opposition to plaintiff's motion, but *not* in their own motion, defendants add an argument that HMSA breached the SMAs relating to the California MRI and the California CT by failing to keep the machines functioning according to manufacturer specifications. Defendants claim that they had problems with the images produced by the machines (i.e., artifacts), coil issues, and overheating/downtime issues, all of which resulted in lost referrals for both machines and additional costs to the defendants when they were forced to lease a temporary replacement MRI for six months. In their opposition brief, but *not* in their own motion for summary judgment, defendants argue that these failures constitute breaches by HMSA, precluding summary judgment in favor of HMSA on its breach of contract claims in the amended complaint. (*Compare*, Defendants' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment, Doc. No. 43 at 5-6, with Defendants' Motion for Partial Summary Judgment, Doc. No. 32 at 7.) To the extent defendants may be attempting to assert this argument as a reason to *grant* them summary judgment on their breach of contract counterclaims, the Court will not consider it because it was not contained in their motion for summary judgment.

provided the same.[9] Plaintiff argues that, although it may strive to perform monthly maintenance, that is not actually required. Defendants assert that HMSA's Director of Sales Administration, Lance Cain, admitted that the maintenance was to be monthly. However, in his deposition, Cain really testified that he is not responsible for scheduling the maintenance calls and, therefore, does not know exactly how it is done. He further testified that, given the fact that the contract calls for "12 times annually," monthly service calls would "make sense." (Cain Dep. at 10-11.) Defendants also point to the deposition testimony of HMSA's Vice President of Service, James Confer, who, when asked whether the maintenance calls were to be performed monthly, answered: "From the contract, it appears so." (Confer Dep. at 88.) Finally, defendants argue that HMSA had an internal policy relating to the schedule for preventative maintenance which required that they be conducted monthly. (*See*, Doc. No. 32, Tab 7.) However, this written policy is undated and, when asked about it at his deposition, John Hahn, HMSA's Director of Support Services, testified that he had never seen it and was unaware of it, even though he also admitted that he was also unaware of anything saying that service did *not* have to be performed monthly. (Hahn Dep. at 25-26.) Cain also testified in the same manner: that he had never seen the policy, but that he was unaware of anything to the effect that service calls need not be monthly. (Cain Dep. at 19.) Finally, defendants assert that allowing HMSA to perform the 12 preventative maintenance calls on anything less than a monthly basis would defy common sense because it

---

[9] The revised SMA for the Texas MRI required preventative maintenance only "quarterly, four (4) times annually[.]" Defendants do not seem to be alleging any breach of that SMA. The SMAs relating to the California CT (CXR46215) and the Texas CT (CXR46222) required preventative maintenance "[s]ix (6) times annually." As noted in the previous footnote, defendants do not appear to claim any breach with respect to the California CT and, as to the Texas CT, they seem to claim that the preventative maintenance was missed only once. Therefore, the Court has concentrated on the meaning of only the contract term that required preventative maintenance "12 times annually." That said, the Court's reasoning as to the meaning of this provision would apply equally to these other provisions.

would allow it to perform all 12 in a single month, if it wanted to, which would defeat the essential purpose underlying the SMAs. In HMSA's contrary view, this term of the contract is clear and unambiguous, prohibiting any consideration of the parole evidence submitted by the defendants.

The underlying purpose of contract construction is to carry out the intent of the parties. *E.S. Preston Assoc., Inc. v. Preston*, 24 Ohio St. 3d 7, 10 (1986). That intent is "presumed to reside in the language they chose to employ in the agreement." *Kelly v. Medical Life Ins. Co.*, 31 Ohio St. 3d 130 (1987), Syllabus ¶ 1. However, "the rule is well-established that where there is doubt or ambiguity in the language of a contract it will be construed strictly against the party who prepared it[...]. In other words, he who speaks must speak plainly or the other party may explain to his own advantage." *Hannenmann v. State Farm Ins. Companies*, No. 1:07cv2712, 2008 WL 2080731, at *4 (N.D. Ohio May 16, 2008) (quoting *McKay Mach. Co. v. Rodman*, 11 Ohio St. 2d 77, 80 (1967)). "'Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument.'" *Aultman Hosp. Ass'n v. Community Mut. Ins. Co.*, 46 Ohio St. 3d 51, 54 (1989) (quoting *Alexander v. Buckey Pipe Line Co.*, 53 Ohio St. 2d 241 (1978), Syllabus ¶ 2).

Construing the contract in light of its purpose, i.e., for inspection and maintenance of MRI machines, it only makes sense to conclude that preventative maintenance "twelve (12) times annually" necessarily means "monthly." To construe it literally as just twelve times a year would produce the "manifest absurdity" that HMSA would have been able to conduct all twelve

maintenance calls within a singe month, if it so chose.[10] This would defeat the entire purpose of having an SMA on a technical and sensitive machine such as an MRI. The fact that defendant was required to pay for the services *in advance* on a regular monthly basis buttresses the conclusion that the maintenance calls were to be performed regularly, that is, monthly. Regular, monthly service and maintenance of these imaging machines was certainly a *material* component of each SMA because it was, in essence, the entire purpose of the contract. Indeed, every one of the contracts at issue here provides, in a section captioned "Charges," that "[c]harges are payable in advance upon receipt of invoice." (*See, e.g.*, Am. Compl. Ex. A, at p. 2.) Under Hitachi's theory that it need only perform maintenance 12 times (or 6 or 4 times) annually, if, for example, it chose to perform all 12 maintenance calls within the first two months of the contract year, the contractual provision requiring payment *in advance* would be rendered meaningless. *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority*, 78 Ohio St.3d 363, 362 (1997) (when construing a contract, the court "must attempt to give effect to each and every part of it, [...] and avoid any interpretation of one part which will annul another part") (citations omitted). The payment scheme clearly contemplates service at regular intervals throughout the year.[11]

> That said, there is a factual dispute over whether the required monthly maintenance calls were made. HMSA argues that, except for the months when defendants' sites

---

[10] The Court acknowledges that another judge of the Northern District of Ohio has construed this contract term to mean literally twelve times annually, not monthly. *See Hitachi Med. Sys. Am., Inc. v. Advanced Med. Resources, Inc.*, No. 5:09cv914, 2010 WL 5348764, at * 4 (N.D. Ohio Dec. 20, 2010) (Adams, J.). The Court is not bound by this ruling and disagrees with its conclusion on this issue.

[11] As mentioned in note 8, *supra*, the Court's construction of "twelve (12) times annually" as meaning "monthly," applies equally to construction of similar provisions in the other SMAs. "Six (6) times annually" would necessary mean "ever other month" and "quarterly, four (4) times annually" would mean "every third month." Regularity is the key issue when it comes to preventative maintenance and that regularity has to be factored in when construing these contracts. This is further buttressed by the contractual term requiring that the monthly service payments are payable "in advance."

were on "service hold" due to their failure to pay, all of the required preventative maintenance calls were made. Defendants argue that HMSA failed to perform nine of the required maintenance calls on the California MRI and six on the Texas MRI. Defendants base this argument on HMSA's failure to provide contemporaneous Field Service Reports (FSR) as evidenced, in their view, by their inability to locate any such FSRs for the months in question in the field service binders provided by HMSA for each machine. HMSA counters by relying on computer printouts of the FSRs maintained in an electronic document management system known as Siebel, printouts which defendants characterize as inadmissible "summaries."

Although the Court construes the phrase "twelve (12) times annually" in the relevant SMAs as requiring *monthly* preventative maintenance, it cannot determine whether HMSA complied with this contract term because that requires resolution of certain facts that are in dispute. However, the Court can also conclude that the monthly preventative maintenance was a *material* term of the contract; therefore, if HMSA did not perform monthly maintenance, defendants were relieved of any duty to pay on the contract.

### c.    Is the Acceleration Clause[12] in Each SMA Enforceable?

Based on the following contractual language, HMSA is suing to recover the entire balance on each SMA from the time of defendants' first defaulted payment:

> Upon the occurrence of an Event of Default, HMSA may, at any time, declare the unpaid balance for the remaining term of this SMA to be immediately due and payable. Any one or more of the following events shall constitute an Event of

---

[12] The parties have referred to the relevant contract provision as an "acceleration clause." However, acceleration clauses are typically found in loan agreements where a particular amount of money is payable in installments and where the default on one installment renders the entire debt immediately due. *See* Black's Law Dictionary (9th ed. 2009) (defining "acceleration clause" as "[a] loan-agreement provision that requires the debtor to pay off the balance sooner than the due date if some specified event occurs, such as failure to pay an installment or to maintain insurance."). *Id.* The clause at issue here is more in the nature of a liquidated damages clause, defined as "[a] contractual provision that determines in advance the measure of damages if a party breaches the agreement." Ohio recognizes the validity of such clauses provided they meet the three-part test set forth below.

Default: (i) *Customer fails to pay any monies due HMSA pursuant to this SMA*; (ii) Customer becomes insolvent, a receiver is appointed for any part of the Customer's property, Customer makes an assignment for the benefit of creditors, or any proceeding is commenced either by or against Customer under any bankruptcy or insolvency laws; or (iii) Customer defaults in any obligation owing HMSA pursuant to this SMA or otherwise. (emphasis added.)

Defendants argue that requiring them to pay the entire balance due on each SMA would amount to an unenforceable penalty under Ohio law.

"Where the parties have agreed on the amount of damages, ascertained by estimation and adjustment, and have expressed this agreement in clear and unambiguous terms, the amount so fixed should be treated as liquidated damages and not as a penalty, if the damages would be (1) uncertain as to amount and difficult of proof, and if (2) the contract as a whole is not so manifestly unconscionable, unreasonable, and disproportionate in amount as to justify the conclusion that it does not express the true intention of the parties, and if (3) the contract is consistent with the conclusion that it was the intention of the parties that damages in the amount stated should follow the breach thereof." *Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27 (1984) (Syllabus) (following paragraph two of the syllabus of *Jones v. Stevens*, 112 Ohio St. 43, 146 N.E. 894 (1925)).

Relying on *Samson*, defendants argue in their brief in opposition to HMSA's motion for summary judgment that this provision "is so unconscionable, unreasonable, and disproportionate in amount that it could not possibly manifest the intent of the parties." (Doc. No. 43, at 17.) In *Samson*, the court stated that "reasonable compensation for actual damages is the legitimate objective of [...] liquidated damage provisions and where the amount specified is manifestly inequitable and unrealistic, courts will ordinarily regard it as a penalty." *Id.* at 28.

24

Defendants argue that making them pay the entire remainder due on each SMA amounts to an unenforceable penalty.

Further, in his affidavit, Choe states that "HMSA did not specifically explain the acceleration clause, its purpose, or its effect [...] prior to the execution of the SMA in 2004 [ and ... that he] did not feel that [he] had any substantive bargaining power to negotiate the essential terms for any of the SMAs as to the purported acceleration clause or standard terms and conditions." (Choe 10/11/10 Aff. ¶ 19.) He further asserts that he "never executed the SMA with any mutual understanding that a single missed payment by one of the MRI Center Defendants on the SMAs would result in the entire balance of the SMAs [sic] remaining term becoming immediately due and payable." (*Id*. ¶ 26.)

Defendants also reason that this clause of the SMA is unconscionable because it allows for a "windfall" for the plaintiff[13] and because an "event of default" occurs if the customer "defaults in any obligation owing HMSA pursuant to this SMA *or otherwise*." (emphasis added.) In other words, HMSA can declare a default for the breach of an obligation totally unrelated to the SMA.

Plaintiff argues that all three elements of the test set forth in *Samson* are met here. First, since these were service contracts that anticipated an unknown amount of parts and labor over their terms, at the time of any breach, the parties would have no way of knowing what future parts or services would have been required had they completed each SMA term. Second, HMSA insists that the contract term is not unconscionable, unreasonable, or disproportionate. HMSA argues that Choe, who negotiated the contracts, is an experienced and educated

---

[13] Defendants argue that this is most evident with respect to the California CT, where HMSA never invoiced for any service to that machine and bases its contract damages claim entirely upon the accelerated damages clause.

businessman who negotiated some terms (e.g., pricing), but not others (e.g., the acceleration provision) and who admitted he had the opportunity to have the SMAs reviewed by counsel, if he so chose, prior to signing. HMSA also argues that defendants cannot establish that accelerated damages are disportionate to actual damages because HMSA "still incurs the same amount of employee costs and still houses the same inventory of service parts and materials, regardless of whether Defendants refuse and/or otherwise do not allow HMSA to continue servicing the medical systems at issue." (Pl.'s Reply Brief, Doc. No. 50 at 15, quoting Pl.'s Obj. and Resp. to Certain Defs.' First set of Int. and Req. for Prod. of Doc., Ans. to Int. No. 13.) Finally, HMSA asserts that Choe's affidavit statements as to his intent and understanding are irrelevant and inadmissible parol evidence with respect to the parties' intent.

The Court finds plaintiff's argument not well-taken. First, liquidated damages are intended to reflect an "estimation and adjustment" of actual damages. There is no evidence that the parties ever negotiated or bargained for this term of the contract, which is clearly a boilerplate term on a pre-printed form contract. At most, *all* that was negotiated was the total contract price.

More importantly, there is also no evidence that the parties ever negotiated an *estimation* of HMSA's actual damages in the event of a breach. Here, the liquidated damages are determined through a simple mathematical calculation, i.e., the number of payments due on the remainder of the contract after any breach multiplied by the monthly contractual payment, and those damages are not then *adjusted* for present value.[14]

---

[14] Further, this amount seems especially unreasonable in light of another contract provision which limits *defendants'* damages in the face of an HMSA breach to "the amounts paid by Purchaser to HMSA for the Agreement." In other words, if defendants made *one* monthly payment and, thereafter HMSA stopped providing maintenance, causing defendants to stop paying, arguably defendants could recover only their one-month's payment as damages for

In addition, plaintiff's argument that its damages would be hard to prove is unpersuasive. Plaintiff undoubtedly had some idea as to the average costs it would incur when it set the total contractual cost and the monthly installments. It is not believable that the plaintiff would simply have pulled a number "out of a hat" without some reference to its business records. Further, the fact that HMSA still incurs the same employee costs and maintains the same parts inventory is irrelevant, absent proof that these defendants are HMSA's *only* customers. *All* employee and inventory costs cannot be attributed solely to the need to supply the *defendants* with service. There is simply no evidence here that a more reasonable liquidated damages amount could not have been estimated through negotiation.

"The determination of whether a liquidated damages provision is an unenforceable penalty is a matter of law to be determined by the Court in light of all the circumstances." *Easton Telecom Services, L.L.C. v. CoreComm Internet Group, Inc.*, 216 F.Supp.2d 695, 699 (N.D. Ohio 2002), citing *Tolle v. Eichel*, 1991 WL 76464 (Ohio App. 5 Dist. 1991). In *Easton*, the court rejected a liquidated damages term contained in a contract between a telecommunications service provider and a customer[15] finding it to be "an unenforceable penalty, void under Ohio law." *Id*.

Having considering all the circumstances and the entire contract, the Court concludes that the clause referred to by the parties as an "acceleration clause" is an unenforceable penalty and is void under Ohio law.

---

HMSA's breach, but HMSA could recover the entire balance of the contract if defendants had breached. This, the Court finds, is unconscionable.

[15] The liquidated damages clause "required the Defendants to pay the full cost for the monthly fee for the remaining months on the contract, in the event the Defendants terminated their service agreement with the Plaintiff." *Easton*, 216 F.Supp.2d at 697.

### d.     Are Defendants Entitled to Consequential Damages?

HMSA relies on the terms of the contract to argue that defendants are not entitled to consequential damages. All of the SMAs in this case provided as follows:

> HMSA shall not be liable for special incidental or consequential damages. Consequential damages shall include, without limitation, loss of use, income or profit or loss of or damage to persons or property.

(Doc. No. 16-4, SMA for the California MRI).[16]

Defendants, on the other hand, assert that this contract term is unenforceable because it was buried in a paragraph labeled "Miscellaneous" and was not in any way conspicuous. They point to provisions of the Ohio Revised Code relating to commercial transactions for the proposition that a written contract for the sale of goods that limits liability for consequential damages must do so in conspicuous language.[17] *See Ins. Co. of N. Am. v. Automatic Sprinkler Corp. of Am.*, 67 Ohio St.2d 91 (1981) (any contractual limitation of remedies "must be a part of the parties' bargain in fact. If it is contained in a printed clause which was not conspicuous or brought to the buyer's attention, the seller had no reasonable expectation that the buyer understood that his remedies were being restricted to repair and replacement. As such, the clause cannot be said to be a part of the bargain (or agreement) of the parties.") (citations omitted). Defendants also assert that this requirement of conspicuousness applies in the context of contracts not involving the sale of goods. (*See* Doc. No. 43 at 19, citing cases). Defendants argue that, although conspicuousness is a fact determination to be made on a

---

[16] As noted above, the SMAs also provided:

> HMSA's liability arising out of or relating to this Agreement shall not exceed the amounts paid by Purchaser to HMSA for the Agreement.

[17] Under O.R.C. § 1302.93(C), "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable, but limitation of damages where the loss is commercial is not."

case-by-case basis, Ohio courts have provided guidance. Clauses have been found to be conspicuous if they were printed in capital letters, in a contrasting typeface, in a contrasting color, under a bold-faced heading, or when a reasonable person ought to have noticed it.

Courts are to "ascertain and give effect to the intent of the parties [to a contract, ... which] 'is presumed to reside in the language they chose to employ in the agreement.'" *Foster Wheeler Enviresponse, Inc. v. Franklin County Convention Facilities Authority*, 78 Ohio St.3d 353, 361 (1997), quoting *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), Syllabus ¶ 1. Although the language of the SMAs, including the language of the liability limiting provision, is not difficult to understand, the Court concludes that the provision is unenforceable for several reasons. First, the entire "terms and conditions" section of each SMA is crammed into a single page and formatted into two columns, requiring that it be in relatively small print. The liability limiting provision is contained near the very end of the second column under a paragraph captioned "Miscellaneous." It provides:

> 11.  MISCELLANEOUS
>
>     This Service Agreement replaces and supersedes any previous Agreement between the parties respecting the subject matter hereof and constitutes the entire agreement between the parties relative to the subject matter hereof.
>
>     HMSA's obligations hereunder are subject to delays incident to labor difficulties; fires; casualities and accidents; acts of the elements; acts of public enemies; transportation difficulties; inability to obtain equipment, materials or qualified labor sufficient to fill its orders; governmental interference or regulations; and other causes beyond HMSA's control.
>
>     HMSA's liability arising out of or relating to this Agreement shall not exceed the amounts paid by Purchaser to HMSA for the Agreement.
>
>     HMSA shall not be liable for special incidental or consequential damages. Consequential damages shall include, without limitation, loss of use, income or profit or loss of or damage to persons or property.

It would not be surprising that the limitation of liability clause would not even be noticed, if it were not pointed out. A reader might see "miscellaneous" and the mention that the service agreement "replaces and supersedes any previous Agreement" and simply assume the section truly did contain relatively inconsequential "miscellaneous" material. Not only is the liability

limiting provision inconspicuous on its own, it is rendered even more so by the fact that other portions of the contract *are* highlighted by way of capitalization and appropriately descriptive headings.

        The Court concludes that the liability limiting provision is unenforceable because it is not conspicuous and was not pointed out or explained to Choe.


      **e.**      **Is Choe Individually Liable?**

        HMSA asserts that Choe is individually liable on two of the SMAs: the one relating to the California CT (CXR46215) and the one relating to the California MRI (A064).

      **1)**      **The California CT (CXR46215)**

        The SMA for the California CT, as described above in the factual background section, shows "Joel Choe" as the "purchaser." It is signed by Joel Choe as the "owner." HMSA asserts that the parties to this contract are Choe and HMSA, making Choe individually liable for the complete failure to make any of the monthly payments. HMSA alleges that the unpaid balance on this SMA is $360,000. (Polon Aff. ¶ 6.)[18]

        Defendants argue that Choe has no personal liability because HMSA knew that he was acting on behalf of KC Imaging, LLC. As proof for this assertion, defendants point to the SMA itself. However, the SMA for the California CT makes absolutely no mention of KC Imaging in any form, so that argument fails.

        Defendants also argue that HMSA was aware that Choe was acting as the agent of KC Imaging due to an earlier SMA that had been executed between HMSA and KC Imaging.

---

[18] Defendants have stipulated that they are seeking no counterclaim damages with respect to this SMA. (Choe 9/21/10 Dep. at 58-59.)

However, that earlier SMA had nothing to do with the California CT; it was for the California MRI. Just because Choe acted at KC Imaging's agent for the California MRI would not place HMSA on notice of any agency with respect to the California CT. Furthermore, Choe himself seems confused about whose agent he was. In his affidavit, he claims to have executed the SMA for the California CT in his capacity as "owner of Hilltop MRI[.]" This statement has no independent support in the record and does not even match the argument made in defendants' opposition brief.

Defendants further argue that there is no individual liability because, "shortly after the execution of the SMAs, the parties novated the SMAs by having each individual MRI Center Defendant assume their [sic] respective contractual obligations under the SMA." (Def. Mem. in Opp'n at 13.)

Under Ohio law, "'a contract of novation is created where a previous valid obligation is extinguished by a new valid contract, accomplished by substitution of parties or of the undertaking, with the consent of all the parties, and based on valid consideration.'" *216 Jamaica Avenue, LLC v. S & R Playhouse Realty Co.*, 540 F.3d 433, 436 (6th Cir. 2008) (quoting *Chicago Title Ins. Corp. v. Magnuson*, 487 F.3d 985, 994 (6th Cir. 2007)). "The person invoking a novation [. . .] bears the burden of establishing its existence." *Id*. "[T]he parties' consent to a novation need not be express, [. . .] but may be implicit 'from the circumstances or a party's conduct.'" *Id*. (quoting *McGlothin v. Huffman*, 94 Ohio App.3d 240, 244 (Ohio App. 12 1994)).

Defendants argue that the record clearly demonstates in several ways that a novation occurred with respect to the California CT SMA. First, under the terms of the SMA, HMSA agreed to perform its services on the specific CT machine. Second, HMSA did not bill Choe personally, but sent all invoices to the Hilltop location. Third, HMSA dealt directly with

31

Hilltop to coordinate service calls and accepted communications and instructions from the Hilltop location for this CT machine. Fourth, documents like Field Service Reports were sent by plaintiff to Hilltop. Fifth, HMSA accepted payment from Hilltop.

The Court is not persuaded by defendants' argument with respect to the California CT. Although it is true that the SMA promised to service this particular CT machine, the Court fails to see how that is any evidence of a novation. Second, defendants have not supplied copies of any invoices to prove who was billed for the services, least of all to show that it was not Choe. Third, defendants point to no record evidence to establish that HMSA took all its instructions from Hilltop with respect to this CT machine. Fourth, the Court has not located in the record any Field Service Reports on the California CT; therefore, there is no way of knowing where those reports, if any, were sent. Finally, HMSA could not have accepted any payments from Hilltop because the allegation is (as admitted by Choe) that *no* payments were made on the California CT.

Defendants have failed to show any evidence of *mutual assent* to relieve Choe of liability under the SMA.[19] Further, by its own terms, the SMA requires that all changes must be in writing. (Doc. No. 16-3 ¶ 11.)

The Court concludes that Choe is individually liable on the SMA for the California CT (CXR46215).

### 2)   The California MRI (A064)

As explained in the factual section above, an SMA for the California MRI was originally entered into between HMSA and KC Imaging, LLC, over Choe's signature. Due to

---

[19] Defendants' novation argument is inconsistent with Choe's insistence that he was never a party to any of the SMAs and intended all along to bind Hilltop MRI to those SMAs.

lengthy delays, a second SMA for the California MRI was signed on June 16, 2006. It shows "Hilltop MRI" as the "purchaser." It is signed by Joel Choe.

HMSA asserts that Choe is individually liable because Hilltop MRI (which is a trade name for Hilltop Radiology, LLC) did not exist in June 2006. Hilltop MRI was not organized and registered in California until July 11, 2008. (*See* Doc. No. 34-5.) According to plaintiff, since Choe held himself out as an agent of a non-existent entity, he is personally liable for the default on this SMA.

Defendants make the same arguments regarding the California MRI as they made for the California CT.[20] They assert that Choe never intended to bind himself personally and that HMSA clearly knew that he was acting on behalf of KC Imaging and Hilltop MRI.

HMSA relies on *James G. Smith & Associates, Inc. v. Everett*, 1 Ohio App.3d 118 (Ohio App. 10 Dist. 1981) for the proposition that, "[w]here there is a fictitious or nonexistent principal, or the principal is without legal capacity or status, and where the agent purports to act on behalf of such a 'principal,' the agent will be liable to the third party as a party to the transaction." *Id.* at 121. However, *James G. Smith* was criticized by *Plain Dealer Publishing Co. v. Worrell*, 178 Ohio App.3d 485 (Ohio App. 9 Dist. 2008), which found "a distinction between a fictitious *name* and a fictitious or nonexistent *principal*." *Id*. at 491.

Here, the "purchaser" listed on the SMA for the California MRI is a fictitious name for its principal, Hilltop Radiology, LLC. Hilltop Radiology was formed on July 11, 2008. Choe testified at his deposition that KC Imaging, LLC was originally formed to operate the Hilltop location. The earlier SMA for the California MRI was executed between HMSA and KC

---

[20] In their memorandum in opposition to the plaintiff's motion for summary judgment, defendants make a single argument under the heading: "Dr. Choe is not Individually Liable for any of the MRI Center Defendants' Purported Contractual Debts Under the SMAs." (*See*, Doc. No. 43 at 12-15.)

Imaging. Therefore, HMSA cannot honestly say that it was unaware that Choe was acting as an agent for a principal.

Accordingly, the Court concludes that Choe is not individually liable with respect to the SMA for the California MRI.


## 2.  Unjust Enrichment Claim

HMSA makes a claim against the defendants for unjust enrichment. Defendants argue in their motion for "partial summary judgment" that any such claim is barred as a matter of law because it "seeks relief for the exact subject matter covered by the express contracts (SMAs) executed between it and the [...] Defendants." (Doc. No. 32, at 14.)

In opposition, HMSA argues that unjust enrichment is claimed in the alternative to breach of contract. It asserts that, until the Court finds that the SMAs and Letter Agreement are valid and enforceable agreements between the parties, it would be premature to abandon or concede the unjust enrichment claim. HMSA argues that defendants have not admitted that the SMAs and Letter Agreement are valid contracts, referring to them only as "forms."

In reply, the defendants assert that they challenge not the validity of any of the contracts but only the enforceability of certain terms (i.e., the acceleration clause and the limitation of liability clause).

"A plaintiff cannot prevail on an unjust-enrichment claim in the absence of fraud or bad faith because recovery under an unjust-enrichment claim is unavailable when the matters in dispute are governed by the terms of an express contract." *Metz v. Am. Elec. Power Co., Inc.*, 172 Ohio App. 3d 800, 811 (Ohio App. 10 Dist. 2007); *see also Terry Barr Sales Agency, Inc. v. All-Lock Co., Inc.*, 96 F.3d 174, 181 (6th Cir. 1996); *Cloverdale Equipment Co. v. Simon Aerials,*

*Inc.*, 869 F.2d 934, 939 (6th Cir. 1989). Here there is no allegation of fraud or bad faith and defendants do not, in fact, challenge the validity of any of the SMAs or the Letter Agreement, even though they challenge the enforceability of some of their terms.

Accordingly, the Court will dismiss the unjust enrichment claim asserted by the plaintiff and, to that extent, the Court grants defendant's motion for summary judgment as to this claim.

## IV. CONCLUSION

For the reasons discussed above, Doc. No. 51 is **GRANTED IN PART and DENIED IN PART**. Paragraphs 6, 7, 12, 14, and 18 are stricken from the Affidavit of Daniel McGuan (Doc. No. 43-12). To the extent paragraphs 11 and 13 contain legal conclusions, those conclusions are stricken. To the extent those two paragraphs state opinions or facts, they will be given whatever evidentiary treatment they deserve under the Federal Rules of Evidence.

Further, each of the motions for summary judgment (Doc. Nos. 32 and 33) are **DENIED**, with rulings as follows on these issues:

1.  Breach of contract claims and counterclaims

    a.  *Defendants' Breach* - Defendants did not make the required payments under the SMAs and, therefore, breached the SMAs.

    b.  *Plaintiff's Breach* - There are material factual disputes as to whether plaintiff performed the required preventative maintenance calls. However, the Court concludes that:

        1)  Preventative maintenance required "twelve (12) times annually" means monthly; "six (6) times annually" means every other month; and "quarterly, four (4) time annually" means every third month;

        2)      This regular performance of preventative maintenance was a material term of each contract;

        3)      If regular preventative maintenance was not performed by the plaintiff, defendants' breach is excused because they would be relieved of any duty to pay on the contract(s).

    c.     *Enforceability of the Acceleration/Liquidated Damages Clause* - This clause is an unenforceable penalty provision and is void under Ohio law.

    d.     *Consequential Damages for the Defendants* - The liability limiting provision in the SMAs is unenforceable because it was not conspicuous and was not pointed out or explained to defendant Choe. That said, defendants still have the burden of proving any amount of consequential damages and proximate cause with respect to the same.

    e.     *Choe's Liability* -

        1)      Choe is individually liable with respect to the California CT (CXR46215);

        2)      Choe is not individually liable with respect to the California MRI (A064).

2.     Plaintiff's Unjust Enrichment Claim - This claim is dismissed in view of the fact that identical claims are brought as breach of contract claims and defendants are not challenging the validity of the SMAs.

        **IT IS SO ORDERED**.

Dated: September 30, 2011              _____

                                             **HONORABLE SARA LIOI**
                                            **UNITED STATES DISTRICT JUDGE**